GARRETT, J.
The plaintiffs, Martin Van Buren, Jr., and his mother, Alvoren Van Buren, appeal *1043 from a jury verdict finding that the defendant, Dr. Claude B. Minor, Jr., did not commit medical malpractice in his treatment of Mr. Van Buren. They also appeal from some rulings made by the trial court before and during the trial. For the following reasons, we affirm.
FACTS
As a young adult, Mr. Van Buren developed kidney disease and had a kidney transplant in 1994. He lived a fairly normal life for approximately 12 years. Eventually he developed more health problems. In July 2007, 39-year-old Mr. Van Buren began throwing up blood and was admitted to a hospital in Rayville. On July 11, 2007, Mr. Van Buren was transferred by ambulance to St. Francis North Hospital in Monroe with hypertension, renal insufficiency, chronic anemia, and chronic transplant nephropathy. He was also diagnosed with a gastric ulcer. On July 17, Mr. Van Buren experienced a massive gastrointestinal bleed.
Mr. Van Buren was in the ICU when Dr. Minor was asked by the hospital to do an emergency surgical consult. As Dr. Minor entered the room, Mr. Van Buren vomited a large amount of blood and went into cardiac arrest. Dr. Minor was able to resuscitate and stabilize Mr. Van Buren and took him to surgery to remove the ulcer. Dr. Minor told Mrs. Van Buren that there was a high likelihood that her son would not survive the surgery.
Dr. Minor removed a large portion of the stomach containing the ulcer and then Mr. Van Buren developed coagulopathy, a condition in which there was bleeding throughout the intestines. After dealing with this development, and in his haste to complete the operation due to Mr. Van Buren's poor condition, Dr. Minor reconnected the stomach to the wrong portion of the bowel. Instead of making the connection in the jejunum, he made the connection in the distal ileum, some 18-19 feet from where the connection should have been made. This error prevented Mr. Van Buren's intestines from being able to absorb food. When he ate, the stomach contents dumped into the ileum causing intractable diarrhea. As a result, he suffered malnutrition and lost a great amount of weight.
Mr. Van Buren made one office visit to Dr. Minor in October 2007. He complained of diarrhea and was told that it frequently occurred after this surgical procedure. At the time of the surgery, Mr. Van Buren weighed approximately 170 pounds. During the five months following the surgery, he lost approximately 70 pounds. In December 2007, the error was discovered and surgically corrected by Dr. Henry Zizzi. Mr. Van Buren also had a third surgery with Dr. Zizzi in 2015, to remove abdominal adhesions which caused a bowel obstruction.
In April 2008, Mr. Van Buren instituted a medical malpractice claim against Dr. Minor by convening a medical review panel. Mrs. Van Buren was later added as a claimant. In January 2011, the medical review panel unanimously found that Dr. Minor's surgery fell below the applicable standard of care. The panel found as follows:
The evidence does support the conclusion that the defendant, DR. CLAUDE B. MINOR, failed to meet the applicable standard of care in the treatment of MARTIN VAN BUREN, JR., as charged in the complaint. The reasons for this conclusion by the PANEL are that:
(1) Martin Van Buren, Jr. was admitted to St. Francis North Hospital on July 11, 2007 with multiple medical problems including a medical history of a kidney transplant with chronic *1044 transplant nephropathy, hypertension, renal insufficiency (approaching end-stage) and chronic anemia. On July 17, 2007 Mr. Van Buren began bleeding acutely and was diagnosed with a gastric ulcer with massive GI bleed. Dr. Minor was consulted. The patient was taken by Dr. Minor to surgery on an emergent basis where Dr. Minor performed a hemigastrectomy with gastrojejunostomyBillroth II. The surgery performed by Dr. Minor was below the standard of care because the surgery was performed at the level of the distal ileum instead of at the jejunum.
(2) As a result of the surgery performed by Dr. Minor on July 17, 2007, Mr. Van Buren experienced severe malnutrition, chronic intractable diarrhea and abdominal pain for approximately five months together with having to undergo another surgery which was performed on December 18, 2007. This panel does not have evidence to be able to comment on Mr. Van Buren's condition after said surgery of December 18, 2007.
In March 2011, the plaintiffs filed this action for damages, claiming that Dr. Minor breached the standard of care and that, as a result of his substandard surgery, Mr. Van Buren suffered excruciating abdominal pain, continual vomiting, intractable diarrhea, weight loss, malnutrition, multi-organ complications, physical pain and suffering, mental anguish and distress, and had an increased risk of death from any of these problems, as well as renal failure. Mr. Van Buren claimed that he required constant care, which was provided by his mother, who asserted her own claim for damages.
In his answer, Dr. Minor denied any liability or negligence. He maintained that the surgery was done under emergency circumstances, Mr. Van Buren's condition worsened during surgery, raising concerns as to whether he could tolerate continued anesthesia and surgery, and Dr. Minor's objective at that time was to get Mr. Van Buren off the table alive, which was accomplished.
The case was tried before a jury which found that the plaintiffs did not prove that Dr. Minor negligently breached the standard of care in his treatment of Mr. Van Buren. The plaintiffs' claims were dismissed. The trial court denied the plaintiffs' motions for judgment notwithstanding the verdict and for new trial after issuing a lengthy written ruling. The plaintiffs appealed.
JURY VERDICT
The plaintiffs first argue that the jury was manifestly erroneous in finding that Dr. Minor did not breach the standard of care. They claim it is indisputable that Dr. Minor connected the stomach to the wrong portion of the intestines and that Mr. Van Buren would have starved to death if the error had not been surgically corrected. They contend that this constituted a breach of the applicable standard of care and is negligence per se. This argument is without merit.
Legal Principles
Regarding medical malpractice actions, La. R.S. 9:2794 provides, in pertinent part:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices *1045 in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
....
C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician [.] The jury shall be further instructed that injury alone does not raise a presumption of the physician's ... negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable.
In a medical malpractice action, the plaintiff has the burden of proving, by a preponderance of the evidence, (1) that the doctor's treatment fell below the standard of care expected of a physician in his medical specialty; and (2) the existence of a causal relationship between the alleged negligent treatment and the injury sustained. Fusilier v. Dauterive , 2000-0151 (La. 7/14/00), 764 So.2d 74 ; Richardson v. Cotter , 51,637 (La. App. 2 Cir. 9/27/17), 245 So.3d 136, 2017 WL 4273441 ; Thompson v. Mangham Home Care, Inc. , 50,598 (La. App. 2 Cir. 7/14/16), 198 So.3d 221, writs denied , 2016-1499 (La. 11/15/16), 209 So.3d 781 ; Johnson v. Morehouse Gen. Hosp. , 2010-0387 (La. 5/10/11), 63 So.3d 87.
A physician is not required to exercise the highest degree of care possible; rather, his duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. Gordon v. Louisiana State Univ. Bd. of Sup'rs , 27,966 (La. App. 2 Cir. 3/1/96), 669 So.2d 736, writ denied , 96-1038 (La. 5/31/96), 674 So.2d 263 ; Richardson v. Cotter , supra. A physician is not held to the standard of perfection or evaluated with the benefit of hindsight. Jackson v. Farquhar , 50,902 (La. App. 2 Cir. 10/5/16), 207 So.3d 1112. The mere fact that an injury occurred does not raise a presumption that the physician was negligent. Hays v. Christus Schumpert N. Louisiana , 46,408 (La. App. 2 Cir. 9/21/11), 72 So.3d 955.
Any report of the medical review panel's expert opinion shall be admissible as evidence in any action subsequently brought by the claimant in a court of law. See La. R. S. 40:1231.8(H). Such expert opinion, however, shall not be conclusive and either party shall have the right to call, at his cost, any member of the medical review panel as a witness. Thus, the opinion of the medical review panel is admissible, expert medical evidence that may be used to support or oppose any subsequent medical malpractice suit. Nevertheless, as with any expert testimony or evidence, the medical review panel opinion is subject to review and contestation by an opposing viewpoint. The opinion, therefore, can be used by either the patient or the qualified health care provider, and the jury, as trier of fact, is free to accept or reject any portion or all of the opinion. McGlothlin v. Christus St. Patrick Hosp. , 2010-2775 (La. 7/1/11), 65 So.3d 1218.
*1046 Appellate review of a trial court's findings in a medical malpractice action is limited. It is well settled that a court of appeal may not set aside a jury's finding of fact in the absence of manifest error or unless it is clearly wrong, and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO , 549 So.2d 840 (La. 1989). In reviewing a factfinder's factual conclusions, an appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Johnson v. Morehouse Gen. Hosp., supra . Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is most credible. Morris v. Rainwater , 51,018 (La. App. 2 Cir. 1/11/17), 218 So.3d 226, writ denied , 2017-0414 (La. 5/1/17), 220 So.3d 744.
Where there are conflicting expert opinions concerning the defendant's compliance with the standard of care, the reviewing court will give great deference to the conclusions of the trier of fact. Morris v. Rainwater , supra ; Prine v. Bailey , 45,815 (La. App. 2 Cir. 12/15/10), 56 So.3d 330 ; Wiley v. Lipka , 42,794 (La. App. 2 Cir. 2/6/08), 975 So.2d 726, writ denied , 2008-0541 (La. 5/2/08), 979 So.2d 1284.
The reviewing court must do more than just simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. The reviewing court must always keep in mind that if the trial court's or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Fusilier v. Dauterive , supra .See also Crockham v. Thompson , 47,505 (La. App. 2 Cir. 11/14/12), 107 So.3d 719.
Discussion
In the present matter, the jury was presented with conflicting expert opinions and testimony regarding whether Dr. Minor breached the standard of care and committed malpractice. The plaintiffs introduced into evidence the opinion issued by the medical review panel. The only panel member who testified in court was Dr. David Remedios, who practiced general surgery in Alexandria. He stated that the panel examined the medical records in this matter, was aware that the surgery was an emergency, and found that Dr. Minor failed to meet the applicable standard of care in his treatment of Mr. Van Buren. According to Dr. Remedios, the treatment was below the standard of care because the surgery was performed at the level of the distal ileum and not the jejunum. This caused intractable diarrhea, which could have been a dangerous, life-threatening condition. If not corrected, most likely Mr. Van Buren would have died of starvation. According to Dr. Remedios, severe malnutrition can make a person more susceptible to infection and can have a continuing impact for months and years. He said if he had a patient with the significant weight loss suffered by Mr. Van Buren, he would have ordered tests to explore the cause.
*1047 On cross-examination, Dr. Remedios said he would usually want to see a patient like Mr. Van Buren two weeks after surgery. Dr. Remedios was not aware that Mr. Van Buren did not return to see Dr. Minor until nine weeks after the surgery and said that if Mr. Van Buren failed to keep follow-up appointments, it could be an indication that he was uncooperative. However, Mr. Van Buren did eventually appear for a follow-up visit, giving Dr. Minor an opportunity to intervene, but he failed to do so. Dr. Remedios was questioned about assumptions made by the panel concerning Mr. Van Buren's condition and the events that transpired, which the defense contended were inaccurate and incomplete.
Dr. Zizzi, the surgeon who performed the corrective surgery in December 2007, was called to testify by the plaintiffs. He said that if he had seen Mr. Van Buren in October 2007, and observed the patient's significant weight loss, he would have ordered tests to see what was happening. Several days after the appointment with Dr. Minor, Mr. Van Buren was admitted to a hospital and then to a long-term care facility. He had a blood infection and was on nutritional support. According to Dr. Zizzi, the dictation from Dr. Minor's surgery led other doctors to think that the procedure had been done correctly and that he had performed a routine hemigastrectomy with Billroth II procedure. In his surgical notes, Dr. Minor stated that Mr. Van Buren "tolerated the procedure well," indicating there were no untoward events during surgery.
A CT scan revealed some abnormalities of the small intestine and Dr. Zizzi was consulted to do corrective surgery. He explained the deficiencies with Dr. Minor's surgery. Dr. Zizzi stated that when the stomach is disconnected from the intestines, it is to be reconnected 8-12 inches into the intestine in the jejunum, an area responsible for digesting and absorbing nutrients. Dr. Minor pulled up the lower part of the small intestine, not the upper part. Dr. Minor missed the proper area for reconnection by 19 feet. If surgery had not been done to correct the error, Mr. Van Buren would have starved to death. Mr. Van Buren's chance of death from underlying conditions was greatly increased.
Dr. Zizzi stated that malnutrition affects multiple organs and diminishes the immune system. He testified regarding the specifics of his corrective surgery and the steps necessary to reconnect Mr. Van Buren's stomach to the correct portion of the intestines. In May 2015, Dr. Zizzi performed a second surgery to correct abdominal adhesions that were causing an intestinal blockage. Dr. Zizzi found a chronic obstruction of the distal ileum due to thick adhesive bands caused by the prior surgeries.
Dr. Zizzi acknowledged that Dr. Minor's surgery was performed under emergency circumstances which posed numerous risks to the patient who was already in shock. These risks included low temperature due to an open abdomen, difficulty with blood clotting, loss of fluids, massive bleeding, and running out of blood products necessary for transfusions. He stated that, in an emergent situation, the goal is to correct the problem as quickly as possible, close the patient, and end anesthesia. The primary purpose of Dr. Minor's surgery was to stop the gastric bleeding and he accomplished that. Dr. Zizzi said:
There's no question that Dr. Minor acted exceptionally well in this-or handled this situation exceptionally well. He was the first person, to my understanding, to see [Mr. Van Buren] when he was hemorrhaging massively. Immediately began resuscitating him. Did all of the things that he needed to do to get him *1048 ready for an operation. Got him to the operating room, stopped the bleeding, and got him off the table and he survived so I think there's no question that he did an exceptional job.
According to Dr. Zizzi, not every technical error or complication necessarily rises to the point of malpractice or deviation from the standard of care.
Dr. Zizzi testified that connecting the stomach to the wrong portion of the intestine is a complication that can occur in an emergency situation. Dr. Zizzi said that, although there was a five-month period between Dr. Minor's surgery and the corrective surgery, Mr. Van Buren did not suffer any permanent gastrointestinal problems other than the necessity of having corrective surgery. He also opined that Mr. Van Buren's kidney failure was not related to Dr. Minor's surgery. Although called as a witness by the plaintiffs, Dr. Zizzi never said that Dr. Minor breached the standard of care.
Mr. Van Buren testified that he was born in 1968. In 1991, he was diagnosed with renal failure due to high blood pressure. He had a kidney transplant in 1994. In July 2007, he began vomiting blood and was admitted to the hospital in Rayville and later transferred to St. Francis where the surgery was performed by Dr. Minor. Several days after the surgery, he began having diarrhea every time he ate. Mr. Van Buren lost a large amount of weight and eventually became totally disabled. Following the surgery by Dr. Minor, Mr. Van Buren had to resume dialysis three times per week. Mr. Van Buren denied being told that he should schedule an appointment with Dr. Minor two weeks after leaving the hospital.
Dr. Sheldon Kottle, an expert in internal medicine, nephrology, hypertension, and public health, who resides in Arizona, testified on behalf of the plaintiffs. His testimony was based upon his review of medical records. According to Dr. Kottle, Mr. Van Buren's symptoms and medical problems following the surgery by Dr. Minor were caused by the surgery. Those symptoms and conditions included profound weakness, malabsorption/malnutrition, anemia, persistent diarrhea, weight loss, cachexia (wasting syndrome), damaged immune system, sepsis, low platelet count, breakdown of skin, and elevated progressive leukocytosis. Mr. Van Buren's condition required him to be fed through the veins. Dr. Kottle said that Mr. Van Buren's renal disease was made worse by malnutrition and expedited the need for dialysis. According to Dr. Kottle, because Mr. Van Buren was not a candidate for another kidney transplant, he would require dialysis for the remainder of his life as result of the "botched surgery."
The plaintiffs introduced into evidence the medical records and bills they claim were attributable to Dr. Minor's surgery and then rested their case. Mrs. Van Buren did not testify.
Dr. Minor testified that he was consulted by the hospital regarding Mr. Van Buren on July 17, 2007. Prior to that date, he had never treated Mr. Van Buren. When he entered the ICU room, Mr. Van Buren vomited a large amount of blood and went into cardiac arrest. Dr. Minor put a large-bore central IV line into Mr. Van Buren's neck and inserted a nasogastric tube into his stomach. He gave him oxygen and started a blood transfusion. Mr. Van Buren was given four or five units of blood in 30 minutes. Dr. Minor was aware that Mr. Van Buren had a large ulcer and noted that renal patients are at high risk for bleeding. It took four or five hours to stabilize Mr. Van Buren and to obtain sufficient blood and platelets to do surgery. Dr. Minor said that, during the surgery, he was worried about coagulopathy, *1049 a condition where the "patient bleeds from everywhere." Dr. Minor placed a clamp on the intestines at the point he intended to connect the stomach. Mr. Van Buren developed coagulopathy and Dr. Minor had to pack the abdomen to stop the bleeding. This required removal of the clamp.
Dr. Minor thought it was urgent to reconnect the stomach to the intestines and conclude the surgery. He grabbed a loop of bowel where he thought the clamp had been and connected the stomach to it. According to Dr. Minor, the bowel was so swollen with blood that there were numerous indentations, making it difficult to see the indentation from the clamp. Dr. Minor acknowledged that he chose the wrong section of bowel to make the connection.
Due to the necessity to conclude the surgery, Dr. Minor did not "run the bowel" to make sure he made the connection in the correct location because this would have caused more bleeding. Dr. Minor put in two drain lines to monitor bleeding and stayed with Mr. Van Buren for one hour in the recovery room to be sure the bleeding was controlled. The normal time for the surgery was three to four hours, but, due to Mr. Van Buren's condition, the surgery was done in one hour and 25 minutes. According to Dr. Minor, Mr. Van Buren would not have survived three hours of surgery. Dr. Minor said he missed the proper area to reconnect the stomach to the intestines due to his haste to conclude the surgery. He was worried about continued bleeding and was concerned that Mr. Van Buren would go into cardiac arrest again.
Dr. Minor said that, following the surgery, Mr. Van Buren improved. He was able to start dialysis within a few days. Dr. Minor said he instructed that Mr. Van Buren come to his office for a follow-up two weeks after discharge from the hospital. Mr. Van Buren did not come for a follow-up visit until October 4, 2007. At that point, Dr. Minor found that Mr. Van Buren had appropriate bowel sounds. He weighed 116 pounds. Dr. Minor did not think Mr. Van Buren was disabled. He prescribed an antispasmodic medication and asked Mr. Van Buren to return in two weeks. If he was still losing weight, Dr. Minor planned to do upper GI testing with a "small bowel follow-through" to see if the stomach was emptying properly. Dr. Minor said this would have shown that the stomach was attached to the wrong section of the bowel and he would have done corrective surgery. Mr. Van Buren did not return.
Dr. Minor testified that he disagreed with the medical review panel opinion. In his view, the panel opinion was not based upon an accurate or complete understanding of Mr. Van Buren's critical condition and all of the circumstances surrounding the surgery. He claimed he did not breach the standard of care because his error was inadvertent and it is "well recognized that that can happen" in emergency situations. Dr. Minor pointed out that Mr. Van Buren was having kidney failure and had an infection when he was admitted to the hospital in July 2007. He also said that Mr. Van Buren's need for dialysis was not caused by the surgery or its complications, but by the cardiopulmonary arrest before surgery which damaged his kidneys. Dr. Minor affirmed that he did everything in his knowledge, training and education to keep Mr. Van Buren from dying.
Dr. Lester Johnson, an expert in surgery, testified on behalf of Dr. Minor. Dr. Johnson was the Chief of Surgery and Director of Surgical Services at LSU Health Sciences Center, E.A. Conway Medical Center in Monroe. He stated that Dr. Minor's medical and surgical intervention, in all probability, saved Mr. Van Buren's *1050 life. He said that the removal of a portion of the stomach was done correctly. There was a complication in reconnecting the stomach to the intestines in that the reconnection was made "in a position distal to where it is generally placed." Dr. Johnson explained that, in emergency situations, these kinds of complications can occur. Even with the complication, Dr. Johnson opined that Dr. Minor complied with the applicable standard of care.
Becky Dumas, a former employee in Dr. Minor's office, testified for the defense. In late October 2007, she talked with Mr. Van Buren on the telephone. He wanted a prescription for pain medication and was told that Dr. Minor wanted to do a test before he prescribed medication. According to Ms. Dumas, Mr. Van Buren was very rude and said he was not going to have any more "damn tests." She claimed that Mr. Van Buren never returned to the office.
On cross-examination, Ms. Dumas acknowledged that the phone call was not documented in Mr. Van Buren's record, even though Dr. Minor told her to do so. She claimed that Mr. Van Buren was a "no show" for his follow-up appointments and that she never saw him in person. Ms. Dumas was shown the documentation of Mr. Van Buren's office visit in October 2007, and acknowledged that he must have attended at least one appointment.
Following deliberations, the jury returned a verdict in favor of Dr. Minor. The first question on the jury verdict form was:
Did the plaintiffs prove, more likely than not, that Dr. Claude Minor negligently breached the standard of care for a surgeon in his treatment of Martin Van Buren?
The jury answered "No." On December 14, 2015, the trial court signed a judgment based upon the jury verdict and dismissed the plaintiffs' claims.
Based upon our review of the record in its entirety, we cannot say that the jury verdict was manifestly erroneous or clearly wrong. The jury was presented with some expert testimony that Dr. Minor breached the standard of care by connecting Mr. Van Buren's stomach to the incorrect portion of the intestines and that the incorrectly performed surgery caused many subsequent health problems for Mr. Van Buren.
However, the jury was also presented with other testimony and expert opinion that, during this surgery, Dr. Minor was faced with an emergency to stop Mr. Van Buren's bleeding, and in his efforts to save the patient's life, committed an error, termed a known complication of surgery, which could happen under the emergency situation and circumstances presented and did not constitute a negligent breach of the standard of care. In addition, the jury heard expert testimony and opinion concerning Mr. Van Buren's health prior to the surgery and that his subsequent need for dialysis and other health problems were not caused by the surgical complication.
Because there were conflicting expert opinions concerning Dr. Minor's compliance with the standard of care, the jury made reasonable inferences of fact and made a determination as to which expert opinion and testimony was most credible. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. As stated above, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. The court of appeal may not reverse if the findings are reasonable in light of the record, reviewed in its entirety, even if this court, sitting as *1051 the trier of fact, may have weighed the evidence differently. This is the situation presented here. Even though this court may have weighed the evidence differently, the jury's choice between conflicting expert medical opinions was reasonable. Therefore, the jury finding is not manifestly erroneous or clearly wrong and this court cannot reverse.
MOTION IN LIMINE
The plaintiffs argue that the trial court committed legal error by denying their motion in limine, which they contend allowed Dr. Minor to improperly appeal to jury sympathy and bias in both testimony and in closing argument. This argument is without merit.
Legal Principles
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403.
A motion in limine presents an evidentiary matter that is subject to the great discretion of the trial court. On appeal, this court must consider whether the complained of ruling was erroneous and whether the error affected a substantial right of the party. Patterson v. State Farm Mut. Auto. Ins. Co. , 51,620 (La. App. 2 Cir. 11/15/17), 244 So.3d 800, 2017 WL 5474116.
All parties are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion and prejudice. Counsel should confine their arguments to the evidence admitted and the inferences that may be properly drawn from it. Ogletree v. Willis-Knighton Mem. Hosp., Inc. , 530 So.2d 1175 (La. App. 2 Cir. 1988), writ denied , 532 So.2d 133 (La. 1988) ; Fields v. Senior Citizens Ctr., Inc. of Coushatta , 528 So.2d 573 (La. App. 2 Cir. 1988). As long as they are based on the facts of the case, however, appeals to sympathy are not necessarily considered improper, and furnish no grounds for complaint. Flights of eloquence and some touches of pathos are even allowable, as long as the foregoing rule is not violated. The test of whether an argument of counsel is prejudicial or inflammatory is whether such comment is unreasonable or unfair in the eyes of the law. Fields v. Senior Citizens Ctr., Inc. of Coushatta , supra . When the language used discloses a studied purpose to arouse the prejudices of the jury, the court cannot overlook it or consider that a party against whom such effort has been made has had a fair consideration of its case at the hands of the jury. It is equally well settled that counsel has great latitude in argument before a jury and fair advocacy not designed to inflame the jury is permissible. Ogletree v. Willis-Knighton Mem. Hosp., Inc. , supra .See also Temple v. Liberty Mut. Ins. Co. , 330 So.2d 891 (La. 1976) ; Cooper v. United S. Assur. Co. , 97-0250 (La. App. 1 Cir. 9/9/98), 718 So.2d 1029.
Discussion
The plaintiffs filed a motion in limine to exclude any testimony or evidence from the defendant "or any of his witnesses that his medical malpractice should be excused because his care 'saved the patient's life.' " The motion was denied by the trial court as overly broad. The trial court stated that it would prevent any unduly prejudicial or sympathy-seeking testimony by any witness during the trial. On the day of trial, the plaintiffs' attorney asked the court to reconsider its ruling. The trial court denied the request.
The plaintiffs assert that, by denying their motion in limine, the court allowed Dr. Minor to argue to the jury that the emergency circumstances and the fact that *1052 Mr. Van Buren did not die from his ulcer or the surgery excused the error of performing the surgery incorrectly. The plaintiffs contend that Dr. Minor defended his malpractice by couching himself "as a courageous doctor faced with a medical emergency who should not be punished or 'condemned' either professionally or financially for a mistake he made."
After examining the entire record, we do not find that the trial court abused its discretion in denying the motion in limine. Dr. Minor never denied that he reattached Mr. Van Buren's stomach to the wrong portion of the intestines. He merely sought to explain the circumstances surrounding that occurrence. Allowing him to explain his actions did not result in an appeal to jury sympathy or bias.
The plaintiffs also maintain that defense counsel ignored trial court instructions to refrain from repetitive appeals to sympathy in the closing argument, leading the jury to render an unjust verdict. On appeal, the plaintiffs raise concerns with several sections of the closing argument. First, they claim that statements at the beginning of the argument demonstrated an appeal to sympathy or prejudice. The defendant's attorney stated:
Today you get to make a simple choice. We are at a crossroads in this community about the standard of care for emergency medicine. You can, today, commend a general surgeon for taking prompt and aggressive and efficient steps to prevent death and save a life or you can condemn that surgeon to the consequences professionally and financially of condemnation for medical malpractice. Those are your choices. You can't simultaneously honor and condemn Dr. Minor. You have to make a choice.
No objection was made to the argument. Much later in closing argument, defense counsel noted that Dr. Zizzi was a witness for the plaintiffs and said, "His most important witness in this trial was Dr. Zizzi, who simply came to court and praised my client for saving his client's life." After defense counsel continued with his argument, plaintiffs' counsel objected, claiming that the argument violated the court's order with regard to appeals to sympathy. The trial court overruled the objection, but reminded defense counsel to refrain from repetitive pleas to sympathy.
The next portion of the closing argument complained of by the plaintiffs is as follows:
A technical complication occurred, which has been resolved and could have been resolved much sooner had the patient been cooperative and done his follow up care. Ladies and gentlemen, our position is that general surgeons who are willing to answer the call in an emergency should be considered and encouraged to do so. They should not be condemned to medical malpractice decisions. We don't think that's justice. That's our view.
Following closing arguments, the plaintiffs' attorney again raised the issue, telling the trial court he felt that defense counsel violated the ruling on the motion in limine, claiming that the trial court stated that "blatant appeals to the issue of saving someone's life would not be permitted." The court noted that its ruling on the motion in limine stated that it would "prevent any unduly prejudicial or sympathy-seeking testimony by any witnesses during the course of the trial." The trial court noted that it had already considered and ruled on the objection.
The plaintiffs argue before us that these comments appealed to sympathy and prejudice and led the jury to render an unjust verdict. This argument is not supported by the record. As stated earlier, the trial court did not abuse its discretion in allowing *1053 Dr. Minor to explain the circumstances surrounding the surgery he performed on Mr. Van Buren. All the comments made by defense counsel in closing argument were based upon the facts of the case and the testimony and evidence adduced. They were not improper appeals to sympathy or prejudice.
We also note that the record shows that both sides presented spirited and zealous arguments to the jury. By way of illustration, in the initial closing argument, plaintiffs' counsel challenged the jurors as follows:
Very shortly, the parties, the lawyers, and the court will turn this case over to your capable hands and you will make the decision that will be rendered in this case. Once that occurs, you will then speak for this community. You become the voice, the mind, the wisdom of this community and what you do will be more than simply resolve a dispute between two parties. What you do and how you fulfill your duties-what your ultimate decision will be will proclaim whether this community, Northeast Louisiana, Monroe, in particular, is entitled to the same quality of medical care that people in other parts of the state receive or whether Monroe is willing to accept a lesser quality of medical care. That decision will be yours and yours alone. A decision in favor of my client, Martin Van Buren, affirms and promotes patient safety whereas a judgment in favor of Dr. Minor rewards unacceptably poor medical care[.]
Later, after defense counsel presented his arguments, the plaintiffs' counsel's first comment during rebuttal was:
As has been typical throughout the trial, the defense misstates and attempts to mislead you.
Although we find nothing improper in the defense closing arguments, we note that they were made in response to matters raised by the plaintiffs. Assuming arguendo that the defense arguments were improper, we observe that, under the facts presented here, the trial court's instructions, before the trial and before deliberations, would be curative. In its initial instructions before the trial began, the court instructed the jury that:
The arguments that the attorneys will make to you in opening and closing statements are not evidence. Your decision on the facts must be based on the testimony and evidence that you see and hear.
Later in the opening instructions, the jury was again instructed that the arguments by the lawyers, as well as any comment or ruling by the trial court, made during the trial were not part of the evidence. The jury was also told, "You must decide the facts without emotion or prejudice, for or against any party." Immediately before the attorneys made their opening statements, the trial court again instructed the jury, "Remember that the statements that the lawyers make now, as well as in their closing arguments, are not evidence."
After the conclusion of the trial and prior to the jury deliberations, the trial court gave the jury the following instruction:
You must decide the facts without emotion or prejudice for or against any party. You should consider the case as an action between people of equal standing in the community. Every party stands equal before the law and every party is to be dealt with as an equal in this court.
The jury was instructed numerous times not to consider the statements of the attorneys as evidence and that the jury's verdict must be based upon the facts, without emotion or prejudice. These instructions counteracted any possible adverse effects *1054 of defense counsel's argument. See and compare Ogletree v. Willis-Knighton Mem. Hosp., Inc. , supra ; Cooper v. United S. Assur. Co. , supra ; Johnson v. Chicago Pneumatic Tool Co. , 607 So.2d 615 (La. App. 1 Cir. 1992), writ denied , 608 So.2d 1009 (La. 1992).
TESTIMONY OF DR. JOHNSON
The plaintiffs claim that the trial court committed legal error by allowing Dr. Johnson to give ultimate conclusions without providing the underlying factual or medical basis for them. This argument is without merit.
Legal Principles
La. C.E. art. 702 provides in part:
A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion[.]
La. C.E. art. 703 states:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
La. C.E. art. 704 provides, in part:
Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact.
La. C.E. art. 705(A) states:
In a civil case, the expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.
La. C.C.P. art. 1425(B) provides:
B. Upon contradictory motion of any party or on the court's own motion, an order may be entered requiring that each party that has retained or specially employed a person to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony provide a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor and the data or other information considered by the witness in forming the opinions. The parties, upon agreement, or if ordered by the court, shall include in the report any or all of the following: exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years. [Emphasis supplied.]
The purpose of the expert report required in La. C.C.P. art 1425(B) is to provide the opposing party with advance notice of the expert's opinion, the basis and reasons for it, and the data and other information considered by the witness in forming the opinions. Moonan v. Louisiana Med. Mut. Ins. Co. , 16-113 (La. App. 5 Cir. 9/22/16), 202 So.3d 529, writ denied , 2016-2048 (La. 1/9/17), 214 So.3d 869. The jurisprudence has interpreted La. C.C.P. art 1425(B) to protect a party from prejudicial surprise at trial by the introduction of evidence not previously known to exist, and against which he could not *1055 have prepared a rebuttal. See Maddox v. Bailey , 2013-0564 (La. App. 1 Cir. 5/19/14), 146 So.3d 590. See also Ditcharo v. State , 2017-0221 (La. App. 4 Cir. 10/18/17), --- So.3d ----, 2017 WL 4700823.
The trial court has great discretion in deciding whether to receive or refuse testimony objected to on the grounds of failure to abide by the pretrial order; any doubt must be resolved in favor of receiving the information. Absent an abuse of discretion, the trial court's decision will be upheld. Moonan v. Louisiana Med. Mut. Ins. Co., supra .
Discussion
Here, the parties were required by a pretrial order to file reports in compliance with La. C.C.P. art. 1425(B). Dr. Johnson submitted his report on January 29, 2013. It provided:
I have reviewed the medical records involved in the Van Buren Vs Minor case.
• Dr. Minor intervened both medically and surgically and aided in all probability with saving Mr. Van Buren's life.
• The surgical procedure was done in a difficult situation which in no way could be considered elective.
• In review of the records it appears that a gastrectomy was correctly performed but the gastro-intestinal anastomosis was performed distal to the usual placement of a Billroth IIGastrojejunostomy.
• The patient became symptomatic because of the distal anastomosis and required additional surgery.
• It is unfortunate that the anastomosis was performed distal to its usual position but distal anastomoses have been reported as complications of even the most mundane elective cases. It is a well known complication and can surely occur in a situation manifest post-arrest and in hemostasis damage control mode.
The defendants submitted their witness list on December 16, 2013, which listed Dr. Johnson as an expert witness. The plaintiffs did not depose Dr. Johnson or make any pretrial objections regarding his report or him being called as a witness. Dr. Johnson was again listed as an expert witness for the defense on the pretrial statement jointly filed by the parties. When he was called to testify at trial, the plaintiffs stipulated that Dr. Johnson was an expert in the field of general surgery. Defense counsel asked Dr. Johnson whether he had an opinion concerning Dr. Minor's compliance or noncompliance with the standard of care for general surgeons in his treatment of Mr. Van Buren. Dr. Johnson said that, in his opinion, Dr. Minor complied with the standard of care. The plaintiffs did not object.
Dr. Johnson was asked why he believed that Dr. Minor complied with the standard of care. Dr. Johnson began to answer the question and plaintiffs' counsel objected to the scope of the narrative. Essentially, the plaintiffs argued that Dr. Johnson's report contained only conclusory opinions, without providing the bases or reasons for them and he should not be allowed to expand on his statement at trial. The trial court sustained the objection.
Dr. Johnson was asked how he thought Dr. Minor handled Mr. Van Buren's life-threatening situation when he first encountered him in the hospital. Plaintiffs' counsel objected that the line of questioning was outside the scope of the La. C.C.P. art. 1425(B) narrative report. The plaintiffs argued that Dr. Johnson should not be allowed to testify to matters not covered in his narrative. In response to a question by the trial court, plaintiffs' counsel said, under *1056 his interpretation of La. C.C.P. art. 1425(B), Dr. Johnson would virtually be limited to reading his written report into the record. Plaintiffs' counsel also said that he objected to Dr. Johnson testifying to ultimate conclusions, and he should not be allowed to give the bases for his conclusions because they were not included in the pretrial report.
The trial court agreed with the plaintiffs that Dr. Johnson's testimony would be limited to what was in the report. The court discussed whether to proceed with the trial and limit Dr. Johnson's testimony to matters in the report or to recess and allow the plaintiffs to depose Dr. Johnson and then recall witnesses to respond to Dr. Johnson's testimony and opinions. The plaintiffs expressed agreement with allowing a reading of the report at trial and nothing else. Plaintiffs' counsel said:
They chose-they made a conscious decision to give the court and me this report without meeting the criteria and they ought to be held to that and I do think that reading [-] that the proper thing to be done is they can read this into the record. I can cross-examine him on this report if I choose to do so and, if not, I don't, and that's the end of it.
Defense counsel agreed to limit Dr. Johnson's testimony to the contents of the report. The court ruled that it would "strictly apply the Code of Civil Procedure Article 1425 [B] and [Dr. Johnson's] comments would be limited to the scope of what is said" in his pretrial report. The plaintiffs did not object.
Dr. Johnson's testimony was basically a recitation of the pretrial report and the plaintiffs did not object further. The plaintiffs declined to cross-examine Dr. Johnson.
On appeal, the plaintiffs argue that the trial court erred by allowing Dr. Johnson to testify over their objection. They claim that the trial court erred by allowing Dr. Johnson to testify at all because that allowed him to give his ultimate conclusions. The record, when read as a whole, shows that at trial the plaintiffs expressed concern over Dr. Johnson stating conclusions without a factual basis, but they stated they were in agreement with limiting Dr. Johnson's testimony to a reading of the contents of the pretrial report.
We do not find that the trial court erred in its decision. Prior to trial, the plaintiffs knew that Dr. Johnson's report did not list detailed reasons for his opinions and conclusions. They made no objections and did not depose Dr. Johnson. At trial, the plaintiffs objected to the testimony only after Dr. Johnson stated his opinion that Dr. Minor did not breach the standard of care. When the trial court ruled that Dr. Johnson's testimony would be limited to matters set forth in the pretrial report, the plaintiffs did not object to that ruling and actually agreed to the manner in which the trial court chose to handle the matter. Under all of these circumstances, the plaintiffs did not preserve any objection for review. See La. C.E. art. 103 ; La. C.C.P. art. 1635 ; McWilliams v. Courtney , 41,725 (La. App. 2 Cir. 12/13/06), 945 So.2d 242 ; Harris v. State ex rel. Dep't of Transp. & Dev. , 2007-1566 (La. App. 1 Cir. 11/10/08), 997 So.2d 849, writ denied , 2008-2886 (La. 2/6/09), 999 So.2d 785.
Further, based upon the facts presented here, we find that the trial court did not abuse its discretion in allowing Dr. Johnson to testify, limited to matters stated in the report. The plaintiffs were not surprised by evidence or other testimony not previously known to exist. The plaintiffs were aware of the contents of the report and had ample opportunity to object prior to trial or otherwise prepare a rebuttal, which they failed to do. When *1057 they voiced an objection at trial, they agreed with the solution crafted by the trial court. Under the facts presented here, the trial court did not err in deciding that Dr. Johnson could testify only as to the contents of this pretrial report. The plaintiffs' argument to the contrary is without merit.
CONCLUSION
For the reasons stated above, we affirm the trial court judgment in favor of the defendant, Dr. Claude B. Minor, Jr., dismissing the claims of the plaintiffs, Martin Van Buren, Jr. and Alvoren Van Buren. All costs in this court are assessed to the plaintiffs.
AFFIRMED.